IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SHEDWARD JOHNSON, | ) | |
| | ) | No. 14 C 8580 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Sidney I. Schenkier |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of the U.S. Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Shedward Johnson ("plaintiff" or "Mr. Johnson") has filed a motion for summary judgment seeking reversal or remand of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") (doc. # 9: Pl.'s Mot. for Sum. J.). The Commissioner has filed her own motion seeking affirmance of the decision denying benefits (doc. # 22: Def.'s Mot. for Sum. J.). For the following reasons, Mr. Johnson's motion is denied and the Commissioner's motion is granted.

## I.

Mr. Johnson applied for benefits on June 28, 2011, alleging he became disabled on November 30, 2010 due to asthma, arthritis, depression and alcohol abuse (R. 107, 189). His date last insured ("DLI") was March 31, 2011 (R. 95). Mr. Johnson's application was denied initially on September 13, 2011 (R. 98, 103), and upon reconsideration on December 23, 2011 (R. 108. 112). Mr. Johnson, represented by counsel, appeared and testified before Administrative Law

---

[1]On February 27, 2015, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 11).

Judge ("ALJ") Daniel Dadabo on December 6, 2012 (R. 48). A vocational expert ("VE") also testified. The ALJ issued a written decision on March 15, 2013, finding that Mr. Johnson was not disabled from his onset date through the date of the decision (R. 28-43). The Appeals Council then denied Mr. Johnson's request for review, making the ALJ's ruling the final decision of the Commissioner (R. 11-13). *Varga v. Colvin,* 794 F.3d 809, 813 (7th Cir. 2015).

## II.

We begin with a summary of the administrative record. Part A sets forth Mr. Johnson's medical history, Part B discusses the testimony provided at the hearing before the ALJ, and Part C sets forth the ALJ's written opinion.

## A.

Shedward Johnson was born on October 9, 1955. His medical record begins in January 2010 with two visits to Weiss Memorial Hospital because of intoxication (R. 247-49).[2] Mr. Johnson also spent nearly two weeks inpatient at the hospital between July 22 and August 4, 2010 because of atypical chest pain; he additionally complained of abdominal pain during his hospital stay (R. 255-64). During this admission, a doctor wrote in Mr. Johnson's progress notes that he exhibited signs of "questionable depression" and suggested Mr. Johnson undergo a psychiatric evaluation (R. 266-67, 273, 276). There is no evidence in the record that Mr. Johnson ever underwent psychiatric testing pursuant to the recommendation. Mr. Johnson was discharged with no prescription ongoing treatment needs regarding his chest or abdominal pain.

Beginning in September 2009, Mr. Johnson also began attending appointments with his primary care doctor, Madhuri Thota, M.D., at the Heartland Health Center (R. 550). Between

---

[2] Although the ALJ found Mr. Johnson had the severe impairment of alcohol abuse, the ALJ made no other findings with respect to this impairment and how it may or may not affect Mr. Johnson's ability to work. Plaintiff does not allege any error regarding the ALJ's treatment of this impairment. Therefore, we will only briefly mention Mr. Johnson's treatment for alcohol abuse.

September 21, 2009 and October 23, 2012, Mr. Johnson visited Heartland Health Center a total of seventeen times.[3] Initially, Mr. Johnson visited Heartland primarily for asthma medication refills and various complaints of joint and abdominal pain.[4] Dr. Thota prescribed Singulair and Abuterol for Mr. Johnson's asthma; she prescribed Ibuprofen, and later Flexeril, for the pain (R. 558, 587). On March 1, 2011, during an appointment regarding treatment for a rash, Dr. Thota noted that Mr. Johnson was experiencing finger clubbing and tremors (R. 590).[5]

Mr. Johnson first complained to Dr. Thota about feeling depressed at a follow up appointment for his asthma treatment on July 5, 2011(R. 598) – three months after his DLI, and one week after his application for benefits, in which he listed depression as one of the bases for his claim.[6] Specifically, Mr. Johnson stated he felt hopeless, with little interest or pleasure in doing things on "[m]ore than half the days," because of the deaths of his two siblings over the previous two years; he also reported he was socially isolating himself and had little appetite and poor sleep (R. 445). Dr. Thota consequently diagnosed Mr. Johnson with Major Depressive Disorder and prescribed Remeron and Zoloft (R. 447).

---

[3]Dr. Thota reported in a Commission medical evaluation and RFC form that she first began treating Mr. Johnson on September 21, 2009, but the first documentation of her treatment of Mr. Johnson is from May 2010 (R. 545).

[4]For example, Mr. Johnson complained of: back pain on June 2, 2010 (R. 553), neck pain on July 21, 2010 (R. 557), abdominal pain on August 25, 2010 (R. 560), leg pain on September 14, 2010 (R. 563), hip pain on December 7, 2010 (R. 575), shoulder pain on February 8, 2011 (R. 586), knee pain on April 5, 2011 (R. 453-54), and shoulder pain on June 6, 2011 (R. 449).

[5]Dr. Thota also documented finger tremors (but not clubbing) at two appointments after Mr. Johnson's DLI, one on February 7, 2012 and a second on October 23, 2012 (R. 626, 656).

[6]Prior to July 5, 2011, Mr. Johnson answered in the negative when asked by the medical staff at Heartland if he had feelings of hopelessness or lack of interest in doing things; treatment notes from these earlier appointments document that he was not exhibiting signs of depression, anxiety, or agitation (R. 550, 561, 578, 580, 585). As close as three weeks prior to reporting depression on his claim for benefits, on June 6, 2011, Mr. Johnson replied "not at all" when an intake screener at Heartland asked him if he had felt down, depressed or hopeless, or had little interest or pleasure in doing things over the previous two weeks (R. 593, 596).

Soon thereafter, Mr. Johnson was the subject of a number of consultative examinations and other written evaluations. Mr. Johnson's physical impairments were the subject of two non-examining evaluations by DDS physicians.

On August 30, 2011, after reviewing the four records from Heartland dated between Mr. Johnson's alleged onset date ("AOD") and DLI, DDS physician Bharati Jhaveri, M.D., determined that Mr. Johnson's application for benefits would be denied for insufficient evidence prior to the DLI (R. 502). Dr. Jhaveri noted that the medical record revealed no respiratory problems, that at one appointment, Mr. Johnson had clubbing and slight tremors of his fingers, and at another appointment, complained of pain in his right shoulder (*Id.*).

On September 8, 2011, after reviewing Mr. Johnson's records from Heartland, Vidia Madala, M.D. also denied Mr. Johnson's claim for benefits (R. 508). With respect to Mr. Johnson's asthma, Dr. Madala found it was not severe because the medical records showed that Mr. Johnson did not have current severe respiratory problems and that inhalers helped his asthma. (*Id.*). With respect to Mr. Johnson's other physical impairments, Dr. Madala found that his gait and neurological exams were normal, and that he had full range of motion and strength in his extremities and no joint enlargement or tenderness, all of which demonstrated an essentially normal physical exam (*Id.*). Together, the two consultative opinions accounted for Mr. Johnson's complaints of difficulty lifting, bending and stair climbing, and noted that he continued to smoke and abuse alcohol, both of which could affect his impairments and which made Mr. Johnson's statements about his abilities only partially credible (*Id.*).

With respect to his mental health impairments, on August 10, 2011, Mr. Johnson underwent a mental status examination with Norton Knopf, Ph.D, a Commission-hired psychologist (R. 475-79). During the examination, Mr. Johnson complained his depression was

"controlling [his] life," and he reported poor appetite, difficulty sleeping, fatigue, loss of interest, and weight loss, along with arthritis in his hands, muscle aches and twitching (R. 475-76). Dr. Knopf opined that Mr. Johnson's thought processes were logical and coherent, and estimated his intellectual ability to be in the borderline range (R. 476). He also noted that Mr. Johnson reported being able to bathe and dress himself, cook, do laundry, shop and take public transportation, but that he spent the majority of his days doing nothing except sitting in his room (R. 477-78). Dr. Knopf diagnosed Mr. Johnson with severe major depressive disorder, anxiety disorder, and alcohol abuse (R. 479). Dr. Knopf did not express any conclusions regarding Mr. Johnson's ability to work.

On September 2, 2011, DDS psychologist David Gilliland, Psy.D, completed two psychiatric review forms for Mr. Johnson (R. 488-500, 510-527). The first document states that it covers the period from November 30, 2010 to March 31, 2011, *i.e.*, the AOD to the DLI (R. 510). In it, Dr. Gilliland checked the box saying that there was insufficient evidence to make a determination about whether Mr. Johnson was disabled prior to his DLI; he did not indicate that an RFC evaluation was needed for this time period (*Id.*). At the end of the document, Dr. Gilliland wrote a short note repeating his assessment that there was insufficient evidence to make a determination and cited his review of records of Mr. Johnson's treatment at Weiss Memorial Hospital for intoxication (R. 510, 522); there is no other information in this document.

The second form completed by Dr. Gilliland states that it is an assessment as of September 2, 2011; on the form, Dr. Gilliland checked the box indicating a full assessment required the completion of both a separate RFC determination as well as referral to another medical specialty to assess coexisting non-mental impairments (R. 488). In the "notes" section of the document, Dr. Gilliland indicates that he had reviewed treatment notes from Heartland

Health and Weiss Memorial Hospital, in addition to Dr. Knopf's report (R. 500). Dr. Gilliland diagnosed Mr. Johnson with an affective disorder (depression), an anxiety-related disorder, and a substance-abuse disorder (R. 488, 491, 493. 496). Next, Dr. Gilliland assessed Mr. Johnson's "Paragraph B" functional limitations as resulting in mild limitations in daily living, and moderate limitations in both social functioning and maintaining concentration, persistence, or pace, with no episodes of decompensation, and no evidence establishing the presence of "Paragraph C" criteria (R. 498-99).

Dr. Gilliland also completed an RFC form, also dated September 2, 2011, which assessed Mr. Johnson as being "not significantly limited" in his ability to perform various functions in the categories of "understanding and memory," "sustained concentration and persistence,"[7] "social interaction," and "adaptation." Dr. Gilliland opined that Mr. Johnson had a mental RFC that left him "mentally capable of performing simple tasks in a rouitine [*sic*] work schedule with reasonable rest periods and limited interaction with the general public" (R. 524-526).

Beginning on October 5, 2011, approximately six months after his DLI, Mr. Johnson began receiving mental health services from The Carl Rogers Institute of Client-Centered Therapy (R. 9-10, 544). The medical record contains no treatment notes, but a letter from psychology extern Katie Poole indicates that Mr. Johnson met with her for 25 sessions between October 2011 and May 2012 (R. 544). Ms. Poole was overseen by Kevin Kukoleck, Psy.D, who co-signed a May 1, 2012 letter Ms. Poole wrote in support of Mr. Johnson's claim for benefits; there is no evidence that Dr. Kukoleck ever saw Mr. Johnson himself (*Id.*). In the letter, Ms. Poole wrote that Mr. Johnson often "withdraws into his room for several days at a time and is unable to eat or sleep" and that Mr. Johnson suffers from leg pain, asthma, chronic dizziness, and

---

[7] Of the eleven different abilities listed in the section titled "Sustained Concentration and Persistence," Dr. Gilliland assessed Mr. Johnson as "not significantly limited" with respect to ten of them, and "moderately limited" only with his ability to carry out detailed instructions (R. 524).

hearing voices (*Id.*). She also opined that Mr. Johnson would not be able to find gainful employment because of his chronic mental and physical health issues. (*Id.*).

Some of Dr. Thota's notes from appointments between September 2011 and April 2012 also document Mr. Johnson's depression. Specifically, on September 6, 2011, at a follow-up appointment for a medication refill, Mr. Johnson reported feeling depressed (R. 603-04). At a November 1, 2011 follow-up appointment related to Mr. Johnson's hepatitis C, Mr. Johnson complained of feeling depressed "[n]early every day," even while taking his medication, but felt like Zoloft was helping him; Dr. Thota responded by doubling Mr. Johnson's Zoloft dosage (R. 617). Notes from appointments for unrelated medical conditions on January 12, 2012, April 24, 2012, and June 4, 2012 relate that Mr. Johnson reported feeling depressed when asked about his mental state by staff at Heartland (R. 621, 628, 634).[8]

On April 24, 2012, Dr. Thota provided the record's only evaluation of Mr. Johnson's physical impairments other than those provided by the agency consultants, a physician's report and RFC assessment diagnosing Mr. Johnson with major depression, persistent asthma, alcohol abuse, Hepatitis C, and hyperlipidemia (R. 545). Dr. Thota wrote that Mr. Johnson had a full ability to walk, bend, stand, sit, push, pull, and speak (R. 546). There was no joint pain, swelling, or tenderness, and no loss of joint motion (*Id.*). In her RFC assessment, Dr. Thota opined that Mr. Johnson had a 20 percent reduction in his ability to travel, perform activities of daily living, stoop, or turn, a 20-50 percent reduced capacity for finger dexterity and fine manipulation in both hands, and was able to lift no more than twenty pounds at a time, with frequent lifting up to ten pounds during an eight-hour workday (R. 548). Other than listing depression as one of Mr.

---

[8] Mr. Johnson never visited Heartland specifically to seek treatment for depression. He was questioned about his mental health as a regular part of the examination process when he visited Heartland for treatment of other issues.

Johnson's diagnoses, Dr. Thota's RFC did not contain an assessment of Mr. Johnson's mental health.

On August 7, 2012, Dr. Thota wrote in a progress note that Mr. Johnson had not been taking anti-depressant medication for the previous seven months, as he had mistakenly believed Singulair was his anti-depressant medication instead of Zoloft (R. 639). Dr. Thota restarted Mr. Johnson's Zoloft prescription (*Id.*). On October 23, 2012, Dr. Thota noted that Mr. Johnson reported feeling depressed "[m]ore than half the days" (R. 654-56).

Mr. Johnson began receiving mental health treatment from therapist Thomas Miller, M.A. in September 2012, eighteen months after his DLI; he saw Mr. Miller for a total of eleven sessions between September and December 2012 (R. 661-63). Mr. Johnson missed several additional appointments with Mr. Miller, claiming he was too depressed to leave his room; at other appointments, Mr. Johnson reported feeling less depressed and in a more positive mood (*Id.*). Mr. Miller wrote a December 1, 2012 letter in support of Mr. Johnson's application for benefits, stating that Mr. Johnson had "periodic episodes of severe depression which may last up to several days at a time," during which Mr. Johnson "isolates himself in his room and cannot find the energy or motivation to get out of bed" (R. 641). Mr. Miller noted this could be symptomatic of Major Depressive Disorder, and wrote that Mr. Johnson "would benefit from a formal psychological evaluation in order to confirm these diagnoses" as well as a "referral to a physician" regarding Mr. Johnson's chronic asthma and arthritis (*Id.*).

Mr. Johnson met with therapist Keven Sprenkle, M.A., between August 2013 and July 2014; Dr. Kukoleck oversaw this treatment (R. 9-10). On July 10, 2014, Mr. Sprenkle wrote a letter in support of Mr. Johnson's claim for benefits, reiterating that Mr. Johnson's depression left him too depressed to leave his apartment for days at a time. Mr. Sprenkle noted that Mr.

Johnson had little sleep or appetite, which was indicative of Major Depressive Disorder (R. 9). Mr. Sprenkle also wrote that Mr. Johnson's asthma and arthritis limited his ability to sleep through the night, to function around his depression, and to find and maintain employment.

**B.**

At the hearing before the ALJ, Mr. Johnson testified that he did not graduate high school. From 2000-2004, Mr. Johnson worked at Milestone Mental Health Care as a cleaner, where he performed housekeeping duties for two years and then did maintenance and shampooed carpets for two years (R. 37, 195). From 2006 to 2011, Mr. Johnson worked sporadically as a security guard (*Id.*). In 2010 and 2011, Mr. Johnson worked as a security guard for Armageddon Services, taking public transportation to work security at six or seven Chicago Bears games; during the games he stood at an entrance watching people enter and leave through the security gates (R. 36, 195). Mr. Johnson testified that he had a break to sit down every hour during the three–to–four hour long games (R. 37). In 2009, Mr. Johnson worked for four months at Cleanslate as a security guard (R. 195). Mr. Johnson also worked for Andy Frain as a temporary security guard in 2006 (R. 36).

Mr. Johnson currently lives in a supportive public housing environment called Mercy Housing (R. 70-71). He testified that his arthritis causes pain in his ankles and that it radiates from his knees to his feet (R. 59). Mr. Johnson said he also sometimes has pain in his hands, and that he takes Ibuprofen for his various pains (R. 59-60). With respect to his asthma, plaintiff testified that he would be unable to shampoo carpets and could not lift ten-to-fifteen pounds (R. 66-67). He also testified that he gets winded walking up a flight of stairs (R. 67). Regarding his mental state, Mr. Johnson explained that he would not be able to work regularly because his

depression caused him to not care about anything and made him unable to leave his room (R. 68-69).

Mr. Johnson's case manager at Mercy Housing is Darcell Chapel, who testified that she had known Mr. Johnson for two years, *i.e.,* since approximately March or April 2011 (R. 76). She also testified that she meets with Mr. Johnson once or twice per week at his apartment complex, helps make sure he sees his therapists regularly, and encourages him to leave his room to socialize with neighbors or visit his family (R. 76-78). She gave her personal opinion that Mr. Johnson was depressed because of the recent deaths of his brother and sister (R. 77).

VE Jeffrey Lucas testified as well. He explained that Mr. Johnson's past work as a cleaner, as performed, was at the light and unskilled level (R. 83).[11] The ALJ then gave the VE a hypothetical that tracked Dr. Thota's RFC.[12] In giving the VE the hypothetical, the ALJ noted that Dr. Thota did not really explain his reasons for reducing Mr. Johnson's fine manipulation ability by 20 to 50 percent, but he would leave the limitation in the hypothetical anyway (R. 85). The ALJ noted that Dr. Thota's RFC did not contain any mental health or environmental limitations, but he added them based on the record (R. 85-86). Specifically, the ALJ's hypothetical to the VE added the limitation of avoiding exposure to dust, fumes, odor or temperature extremes, presumably due to Mr. Johnson's asthma (*Id.*). Based on Dr. Gilliland's RFC finding that Mr. Johnson had moderate restrictions due to depression, the ALJ also included in the hypothetical a need to avoid public contact and have no frequent communication, as well

---

[11] The VE explained that, while the job of housekeeper/cleaner is generally classified at the medium exertion level, Mr. Johnson testified that he lifted only ten to fifteen pounds regularly when performing the job, which placed it in the light exertion level (R. 91-92).

[12] That is, the hypothetical included the full ability to walk, stand, bend, stoop, push, pull, speak, and sit, a 20 percent reduction in the ability to turn, climb, travel or engage in gross manipulation, a 20 to 50 percent reduction in the ability to engage in fine manipulation, use left or right hand finger dexterity, or engage in activities of daily living, and the ability to lift 20 pounds occasionally and ten pounds frequently (R. 85).

as a limitation to "unskilled work of a routine nature [that] stays the same day to day" (*Id.*). The ALJ also asked the VE to opine what portion of a work day an employee must remain "alert, productive, and meeting performance expectations" to sustain a job once they got it (R. 89). The VE explained that, depending on the job, the most an employee could be off-task was fifteen-to-twenty percent of the time (R. 88-89).

Given all of these limitations, the VE testified that the job of cleaner, particularly in an office or household, would be available for Mr. Johnson (R. 88-89). Upon questioning by Mr. Johnson's attorney, the VE confirmed that in his analysis of available jobs that fit the hypothetical, he took into account Dr. Thota's limitation of a 20 to 50 percent reduction in bilateral finger dexterity (R. 90-91).

## C.

In his opinion dated March 15, 2013, the ALJ followed the familiar five-step process for determining disability, 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a), and found that Mr. Johnson's asthma, major depressive disorder, and alcohol abuse were severe impairments, but that none of them met or equaled a listing (R. 29-30).[13] The ALJ then set Mr. Johnson's residual functional capacity ("RFC") as the ability to perform light work as defined at 20 C.F.R. 404.1567(b) and 416.967(b), except that he had to avoid "excessive dust, fumes, odors or temperature extremes, and only could perform unskilled work that is routine, which stays the same day-to-day and which involves no specific public control or frequent interaction" (R. 33).

---

[13]The ALJ did not find that Mr. Johnson's arthritis was a severe impairment. While the medical record does contain treatment notes showing that Mr. Johnson sometimes complained about pain or cramping in his legs, shoulders or knees during visits to Heartland, treatment notes also show that he consistently had normal range of motion, little or no joint swelling, and only mild tenderness (R. 454, 564, 575). There is no formal diagnosis of arthritis in the medical record, including in the RFC report completed by Dr. Thota (R. 545-48). While Mr. Johnson contends that the ALJ erred in not including some of Dr. Thota's postural limitations in his RFC, he does not argue that the ALJ erred in declining to find his arthritis to be a severe impairment.

In support of his RFC determination, the ALJ discussed the medical record, Mr. Johnson's testimony, and the various medical opinions. With respect to Mr. Johnson's physical impairments, the ALJ noted generally that Mr. Johnson's medical care for his asserted complaints of asthma and arthritis has been conservative and consisted primarily of non-acute medical attention. For example, Mr. Johnson's asthma was well-controlled with medication and, except for a single hospitalization for unspecified chest pain not definitively related to asthma, he has not had any treatment beyond oral medication and occasional inhaler use (R. 39-40). The ALJ also commented that Mr. Johnson continued to smoke despite recommendations from his doctor that he stop (*Id.*).

Of the medical opinions concerning Mr. Johnson's physical impairments, the ALJ gave the opinion of Dr. Thota "some weight" and the opinion of "the DDS consultants" great weight (R. 40).[14] In discussing Dr. Thota's opinion, the ALJ reviewed Dr. Thota's treatment notes from Heartland Health and then evaluated Dr. Thota's RFC, explaining that the doctor's opinion of Mr. Johnson's physical abilities coincided with the ALJ's RFC determination, with the exception of Dr. Thota's manipulative limitations. The ALJ explained that he found no medical etiology to support such limitations (R. 34-35).

The ALJ also discussed at length Mr. Johnson's mental health history. He summarized Dr. Knopf's examination results and then discussed Dr. Gilliland's finding in his first psychiatric review form that there was insufficient evidence prior to the DLI to make a disability determination. Next, the ALJ discussed that Dr. Gilliland found only mild or moderate

---

[14]While plaintiff argues that the ALJ did not specify which DDS consultants' opinions he relied upon, we note that the ALJ did in fact mention by name DDS consultant Dr. Jhaveri, who opined about Mr. Johnson's physical abilities, noting that Dr. Jhaveri had found insufficient evidence of disability prior to the DLI (R. 34). The ALJ also specifically discussed the opinions of DDS physicians, Knopf and Gilliland, when weighing the medical opinions concerning Mr. Johnson's mental health.

limitations of the "Paragraph B" criteria, and that his assessment of Mr. Johnson's mental health RFC found no significant limitations in Mr. Johnson's ability to understand and carry out simple instructions or to adapt, and only moderate mental limitations in his ability to interact appropriately with the public (R. 35). This led Dr. Gilliland to opine that Mr. Johnson was capable of performing simple tasks in a routine work schedule with reasonable rest periods and limited public interaction (R. 36).

Next, the ALJ discussed the opinions of Mr. Johnson's treating mental health providers, and explained why he gave them minimal weight. Specifically, he explained that Dr. Kukoleck[15] and Mr. Miller (1) saw Mr. Johnson "only intermittently with many no shows," (2) inconsistently noted Mr. Johnson was looking for work, which begged the question of whether he could work, (3) gratuitously commented on Mr. Johnson's physical impairments outside their purview, and (4) failed to provide formal mental status examinations to support their opinions (R. 40). Moreover, the ALJ noted that Mr. Johnson had been off his depression medication for seven months as of August 2012, which raised the question of whether Mr. Johnson may have experienced fewer symptoms if he had taken his medication consistently (*Id.*).

The ALJ found Mr. Johnson "not entirely credible" when he described his physical and mental health symptoms, their intensity, and their limiting effects (R. 39). In addition to noting that Mr. Johnson had mostly conservative and non-acute treatment, the ALJ cited Mr. Johnson's continuing to smoke as well as his intermittent work as a security guard as evidence that he was more physically and psychologically able to work than he testified (R. 40). Moreover, the ALJ noted that even prior to his alleged onset date for disability, Mr. Johnson had worked only sporadically, which raised the question whether his current unemployment is actually because of

---

[15]The ALJ refers only to Dr. Kukoleck and does not mention or appear to recognize that Mr. Johnson actually met with therapists who had, at most, a master's degree, and not someone with a doctorate in psychology.

his impairments (R. 41). Mr. Johnson did not make specific complaints of pain at many of his appointments, and told his therapist Mr. Miller that he was looking for some type of work to keep himself occupied, which tended to make him feel better (*Id.*). The ALJ also noted that Mr. Johnson was able to engage in a number of daily activities including cooking, bathing, dressing himself, shopping, taking public transportation alone, and occasionally visiting with family, and was not limited to the extent one would expect, given his testimony about disabling symptoms (R. 41). Finally, Mr. Johnson inconsistently discussed his drinking habits, denying alcohol use during at least one appointment at Heartland but admitting to drinking beer during his consultative examination and experiencing several episodes of serious intoxication (*Id.*).

Based on his consideration of Mr. Johnson's RFC, at Step Four, the ALJ found that Mr. Johnson was capable of performing his past relevant work as a housekeeper/cleaner.

## III.

The Social Security Act, 42 U.S.C. § 405(g), requires us to uphold the findings of the Commissioner if they are supported by substantial evidence. *Terry v. Astrue,* 580 F.3d 471, 475 (7th Cir. 2009). Therefore, we will reverse the Commissioner's findings only if they are not supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In doing so, we may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue,* 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). Instead, we must look to whether the ALJ built an "accurate and logical bridge" from the evidence to his conclusion that the claimant is not disabled. *Curvin v. Colvin,* 778 F.3d 645, 648 (7th Cir. 2015).

Plaintiff makes three arguments in favor of remand: (1) the ALJ's analysis of the medical opinion evidence was legally deficient; (2) the ALJ failed to include one of his assessed limitations in his hypothetical to the VE, making his RFC determination legally insufficient; and (3) the ALJ's credibility determination was in error (Pl. Mem. in Support of Mot. for S. J. at 9, 16, 18). We address each argument in turn.

A.

Mr. Johnson argues that the ALJ erred by not giving controlling weight to the opinions of his treating physicians Drs. Thota and Kukoleck, and instead giving greater weight to the opinions of the state agency consultants. We disagree.

An ALJ must give controlling weight to a treating physician's opinion if the opinion is both supported by "medically acceptable clinical and laboratory diagnostic techniques," and is "not inconsistent" with substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2). Only an "acceptable medical source" can be considered a treating physician whose opinion may be entitled to controlling weight, although the ALJ must still consider the opinions of other health care providers and non-medical sources. 20 CFR 404.1502, 20 CFR 416.902. Acceptable medical sources include licensed physicians and licensed or certified psychologists. *Id.* Other medical sources, who are not considered treaters, include nurses, licensed clinical social workers, and other therapists. 20 CFR 404.1513(d), 20 CFR 416.913(d). Non-medical sources include such individuals as public and social welfare agency personnel, caregivers, and rehabilitation counselors. *Id.* While the opinion from a non-acceptable source cannot establish a disability, it may be considered to provide insight into the severity of an individual's impairment and how it affects his or her ability to function. *Id.*

When an ALJ decides to give a treating physician less than controlling weight, he or she must consider six criteria in deciding how much weight to afford a medical opinion: (1) the nature and duration of the examining relationship, (2) the length and extent of the treatment relationship, (3) the extent to which medical evidence supports the opinion, (4) the degree to which the opinion is consistent with the entire record, (5) the doctor's specialization, if applicable, and (6) other factors which validate or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(d)(6). If the ALJ decides not to give controlling weight to a treater's opinion, he or she must use these factors to minimally articulate sound reasons for that decision. *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir. 2007), 20 C.F.R. § 404.1527(c).

## 1.

Mr. Johnson first argues that the ALJ erred by giving greater weight to the opinions of the non-examining state agency consultants, who found that Mr. Johnson had no physical impairments prior to his DLI, than he did to the opinion of his treating physician, Dr. Thota. As an initial matter, we find that although the ALJ stated that he gave Dr. Thota's opinion only "some weight," a review of the ALJ's decision shows that in fact, he credited a large part of Dr. Thota's RFC assessment. The ALJ explained that the light work RFC that he assigned Mr. Johnson almost completely correlates with the one assessed by Dr. Thota. The only exception to fully adopting Dr. Thota's RFC that the ALJ noted is with regard to the manipulative limitations, which the ALJ explained were not supported by any medical etiology.

Plaintiff argues that the ALJ failed to sufficiently explain his reasons for rejecting Dr. Thota's manipulative limitations. We find that the ALJ's reasoning for not adopting Dr. Thota's manipulative limitations, although brief, does not require remand. The record evidence of Mr. Johnson's hand and finger impairments is sparse – three Heartland records (none of which were

for appointments related to joint pain) noting mild finger tremors or clubbing (two of which are dated after the DLI), and Mr. Johnson's own testimony at the hearing that occasionally, his hands "clamp up, too, a little bit, but that don't too often" (R. 59). The evidence of hand clamping is not supported by any laboratory and diagnostic techniques, and the ALJ noted at the hearing that Dr. Thota gave no explanation in his RFC for the manipulative limitations. Moreover, the state consultative examiner whose opinion the ALJ credits (Dr. Jhaveri) specifically reviewed the records of Mr. Johnson's finger tremors and clubbing before determining that there was insufficient evidence to find a disability. Therefore, we find that the ALJ's determination that there is insufficient etiology to accept Dr. Thota's manipulative limitations is supported by adequate evidence. *See,* 20 CFR 404.1527(c)(2).

Plaintiff correctly notes that the ALJ did not explain why the RFC did not include Dr. Thota's 20 percent reduction in Mr. Johnson's ability to stoop, turn, climb, and travel, and argues that these failures require remand. With respect to these additional postural limitations found by Dr. Thota, we note that activities such as stooping, climbing, bending, and traveling are generally not included in the definition of "light work," 20 C.F.R. § 404.1567, so it was not inconsistent for the ALJ to assign Mr. Johnson a full light work RFC and omit these additional limitations. But, even if the ALJ erred by not explaining why he omitted these limitations from his RFC, the error is harmless because the hypothetical that the ALJ gave the VE during the hearing did in fact include all of the postural and manipulative limitations recommended by Dr. Thota, and the jobs the VE determined remained available to Mr. Johnson – a determination the ALJ accepted – accounted for these limitations as well.

Plaintiff further argues that the opinions of the state consultants concerning Mr. Johnson's physical limitations were unreliable in any event because they found that Mr. Johnson

did not suffer from severe respiratory problems, a decision at odds with the ALJ's determination that Mr. Johnson had the severe impairment of asthma. The consultative doctors found that (1) Mr. Johnson had no respiratory problems prior to his DLI, and (2) had no severe respiratory problems in September 2011 based on a current exam, although his medical records showed a history of asthma. The fact that the ALJ decided to find, based on additional evidence such as Mr. Johnson's testimony and Dr. Thota's RFC assessment, that Mr. Johnson had the severe impairment of asthma does not make unreliable every medical opinion that they offered. Moreover, the fact that the ALJ ultimately assessed an RFC that was *more* restrictive than the Commission doctors' opinions suggest is not itself grounds for remand. *Reed v. Colvin,* No. 2:12 cv 331, 2013 WL 4584553 at *7 (N.D.Ill. August 28, 2013).

2.

Next, plaintiff contends that the ALJ erred by not giving controlling weight to the opinions of Dr. Kukoleck (and to that of therapist Miller) that plaintiff would be unable to hold a job because of his mental and physical impairments. We disagree, and find that the ALJ's decision to give only minimal weight to Mr. Johnson's mental health providers, and instead to give controlling weight to the DDS consultants, was not error.

The ALJ's decision to give Dr. Kukoleck's opinion minimal weight because it focused unduly on physical health issues is consistent with the Social Security regulations, which instruct an ALJ to give greater weight to opinions which are within the area of the treater's expertise. 20 C.F.R. § 404.1527(d). Further, the ALJ noted that Dr. Kukoleck's opinion was not based on formal mental status evaluations or other diagnostic criteria, and that the only formal mental health evaluation was conducted by the state examiner, Dr. Kropf. *Id.* Finally, the ALJ found Dr. Kukoleck's opinion that Mr. Johnson was unable to work was inconsistent with the fact that he began working as a security guard at Chicago Bears games after his alleged disability onset date,

18

as well as his statements to his therapists that he was looking for a job because he felt better when working.

While we recognize that a claimant's attempts to work part-time do not indicate an ability to engage in full-time employment, *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 918 (7th Cir. 2003), *cited by Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013), in this case, the ALJ considered Mr. Johnson's experiences working as a football security guard and passing out flyers not as evidence that he could engage in full-time work, but as casting doubt on his contention that his depression makes him unable to focus or interact with the public. We find no basis to disturb the ALJ's interpretation of that evidence.

The ALJ's treatment of therapist Miller's opinion was also sufficiently supported in his decision, particularly because Mr. Miller is not an acceptable medical source whose opinion is entitled to controlling weight. Mr. Johnson did not start meeting with Mr. Miller until nearly eighteen months after his DLI. The ALJ noted that Mr. Johnson reported feeling better mentally during a number of appointments (which corresponded to his restarting his depression medication), and also that Mr. Johnson and Mr. Miller discussed Mr. Johnson trying to find work, because keeping busy helped his mental state. We find no error in the ALJ's determination not to give more than minimal weight to Mr. Miller's opinion.[16]

In any event, even if the ALJ erred in describing the reasons he gave minimal weight to Mr. Johnson's mental health providers, the error was harmless because there is insufficient evidence to show that Mr. Johnson's depression began prior to his DLI. Although he did not

---

[16] We recognize that an individual's physical health problems may affect his or her ability to cope with mental health impairments, and that an ALJ should not completely discount a medical source opinion because it discusses medical issues outside the provider's area of expertise. But the regulations also allow an ALJ to weigh more strongly those opinions that coincide with the treater's area of expertise. The ALJ stated that Dr. Kukoleck's and Mr. Miller's discussion of Mr. Johnson's physical impairments detracted from the impartiality of their opinions, which we do not find to be a particularly helpful determination. But we are satisfied that the ALJ's other reasons for giving Dr. Kukoleck's and Mr. Miller's opinions minimal weight are supported by the evidence.

discuss the DLI issue at length (and the parties do not mention it at all), the ALJ gave great weight to Dr. Gilliland's opinion that there was insufficient mental health evidence prior to Mr. Johnson's DLI to make a finding of disability. The medical evidence (or, in this case, the lack of it) supports the ALJ's reliance on Dr. Gilliland's opinion.

To show that his depression is disabling, Mr. Johnson must establish that the impairment began prior to his date last insured. *See, Pepper v. Colvin*, 712 F.3d 351, 355 (7th Cir. 2013) (a "critical inquiry is whether [claimant] became disabled at any time prior to . . . the date [claimant] was last insured"). It is true that an ALJ must consider all relevant evidence of disability, including post-DLI evidence, which may be relevant to the question of whether the disability began prior to the DLI. *Parker v. Astrue,* 597 F.3d 920, 925 (7th Cir. 2010). Usually, post-DLI evidence is used to bolster claims that an impairment was severe enough to preclude all employment prior to the DLI. *See, e.g., Wamser v. Colvin*, No. 12 C 6197, 2013 WL 5437352,(N.D.IL, September 30, 2013) at *7-8 (finding that post-DLI medical opinions were relevant where plaintiff underwent significant mental health treatment both prior to and after her DLI, and there was no evidence that plaintiff's mental impairments substantially worsened post-DLI). But generally, in those cases, there was medical and other evidence of treatment for the impairment prior to the DLI as well. *Id.*

By contrast, in this case, even considering the opinions of Dr. Kukoleck and Mr. Miller, there is almost no evidence that Mr. Johnson suffered from depression prior to his DLI. The only mentions of depression prior to March 31, 2011, are a July 2010 notation in a record from Weiss Hospital – not related to mental health treatment – that Mr. Johnson had "questionable depression" and suggesting he undergo a psychiatric examination, and his August 2011 statement to Dr. Knopf that he had been feeling depressed for two years because of the deaths of

his siblings.[17] This evidence is not adequate on its own to show that Mr. Johnson suffered from the severe impairment of depression prior to his DLI. 20 C.F .R. § 404.1508 (An impairment "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [claimant's] statements of symptoms").

None of the therapists Mr. Johnson saw after his DLI opined that his depression began prior to his first complaint of it in July 2011[18] and Mr. Johnson points to no other evidence to contradict the opinion of Dr. Gilliland that, as of Mr. Johnson's DLI, there was insufficient evidence to establish disability based on a mental health impairment. Indeed, even the RFC completed by Dr. Thota, who prescribed Mr. Johnson's depression medication, did not opine that Mr. Johnson was unable to work because of a mental health impairment.

This is not a case in which the ALJ ignored pre-DLI evidence of disability or cherry-picked only that evidence that supported his conclusion; on the contrary, the ALJ discussed at length all of Mr. Johnson's mental health treatment, and his consultative examination, before determining that Mr. Johnson was not entirely precluded from working. *See, e.g. Reid v. Astrue*, 2011 WL 1485276 (C.D. Ill. 2100) (finding ALJ erred in ignoring evidence and testimony about claimant's pre-DLI mental health issues). In sum, we find that the ALJ's treatment of the medical opinions in the record was sufficiently supported, that the ALJ did not err in determining that the medical opinions did not demonstrate that Mr. Johnson was disabled prior to his DLI,

---

[17] Although Mr. Johnson's case worker, Ms. Chapel, also testified that she believed Mr. Johnson was depressed, she did not meet Mr. Johnson for the first time until around the time of his DLI and her testimony did not specify when, after that date, she first came to believe that Mr. Johnson suffered from depression.

[18] Psychology extern, Katie Poole, mentioned in her letter in support of his claim for benefits that Mr. Johnson reported feeling depressed since June 2010, but neither she nor any other of Mr. Johnson's mental health professionals make any finding of the onset date of his depression. Moreover, Ms. Poole incorrectly notes that Mr. Johnson was seeing a psychiatrist who prescribed medication. There is no evidence in the record that Mr. Johnson ever saw a psychiatrist; his treating physician Dr. Thota (a family practitioner) prescribed the Zoloft he took for depression – a prescription she first gave Mr. Johnson in July 2011, three months after his DLI.

and that any alleged shortcomings by the ALJ in the explanation for his determination were harmless.[19]

## B.

Mr. Johnson argues that the ALJ's RFC was insufficient because the hypothetical the ALJ gave the VE did not include language indicating that Mr. Johnson had moderate difficulties maintaining concentration, persistence and pace; plaintiff argues that, as a result, the VE's opinion that Mr. Johnson could perform his past job as a cleaner was erroneous. Mr. Johnson relies on *O'Connor-Spinner v. Astrue,* 627 F.3d 614, 620 (7th Cir. 2010), for the proposition that a hypothetical that uses only terms such as "simple, repetitive tasks" does not adequately put the VE on notice that the claimant is has limitations in concentration, persistence and pace, and that therefore, the ALJ's hypothetical erroneously failed to inform the VE of the totality of Mr. Johnson's limitations.

The *O'Connor-Spinner* court found that reliance on a hypothetical limited to unskilled work and involving repetitive tasks with simple instructions did not adequately account for the claimant's demonstrated depression-related problems with concentration, persistence and pace. 627 F.3d at 620. However, the appeals court also held that a hypothetical need not include the specific words "concentration, persistence and pace," so long as other evidence showed that the VE was adequately apprised of the claimant's limitations through independent review of the medical record or from hearing testimony. *Id.* The *O'Connor-Spinner* court held such "other

---

[19] The ALJ also gave little weight to the opinion of Ms. Chapel, Mr. Johnson's case worker, because it was inconsistent with Mr. Miller's therapy notes, Dr. Thota's progress notes, and appeared to have been a sympathetic opinion (R. 40). While the ALJ could have provided more detail regarding the inconsistencies between Ms. Chapel's testimony and Mr. Miller's and Dr. Thota's notes, we note that Ms. Chapel's testimony that Mr. Johnson becomes more depressed around the holiday season is not supported by December 12, 2012 and December 19, 2012 notes from Mr. Miller that Mr. Johnson was in a positive mood. Moreover, absent evidence that the ALJ's credibility determination was patently wrong, we will not disturb the ALJ's opinion that Ms. Chapel appeared to be sympathetic to Mr. Johnson, given that the ALJ had the opportunity to observe and question her during the hearing. *Schmidt v. Astrue,* 496 F.3d 833, 843 (7th Cir. 2007).

evidence" did not exist in that case because the ALJ gave the VE a series of increasingly restrictive hypotheticals, which led to the concern that the VE's attention was focused on the hypotheticals and not the record.

In this case, although the ALJ did not use the words "concentration, persistence and pace" in his hypothetical to the VE, a review of the VE's testimony at the hearing satisfies us that he was sufficiently apprised of Mr. Johnson's limitations when he opined that Mr. Johnson was able to perform his previous job of cleaner. During the hearing, the ALJ specifically asked the VE about the portion of a single work day that an individual could be off task, particularly questioning how long a worker must remain "alert, productive, and meeting performance expectations" in order to sustain a job (R. 89). The VE testified that an individual could be off-task at most fifteen to twenty percent and still keep any of the jobs about which he testified. This inquiry specifically describes limitations in concentration, persistence and pace, as they concern "the ability to stick with a given task." *O'Connor-Spinner*, 627 F.3d at 620 (collecting cases).

Furthermore, the *O'Connor-Spinner* court held that a second scenario in which the exact words "concentration, persistence and pace" were not required was when the ALJ's alternative phrasing specifically excludes those tasks that someone with the claimant's particular limitations would be unable to perform. *Id.* In this case, the Mr. Johnson was assessed to have only a single limitation related to concentration, persistence and pace – the ability to follow detailed instructions.[20] The hypothetical the ALJ gave the VE asked about Mr. Johnson's ability to

---

[20] While Dr. Gilliland's assessment of Mr. Johnson's "Paragraph B" mental health functions indicated generally that Mr. Johnson was moderately limited in areas of concentration, persistence and pace, the doctor further refined this assessment in the mental health RFC he completed at the same time. This RFC identified the "ability to carry out detailed instructions" as the single activity related to "sustained concentration and persistence" for which Mr. Johnson had a moderate limitation (R. 524). Dr. Gilliland opined that Mr. Johnson was not significantly limited in the remaining ten activities described in this category. These activities are: the ability to carry out very short and simple instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule, the ability to sustain an ordinary routine without special supervision, the ability to work in coordination with or proximity to others without being distracted, the ability to make simple, work-related

perform unskilled work of a routine nature that stayed the same from day to day. We are satisfied that this limitation adequately accounted for Mr. Johnson's limitations in following detailed instructions.

We are mindful that in *Craft v. Astrue,* 539 F.3d 668, 677 (7th Cir. 2008), the appeals court remanded the case because ALJ did not make a finding as to what aspects of "unskilled work" the claimant had the ability to perform. In contrast, the ALJ here credited Dr. Gilliland's opinion, which found that Mr. Johnson could carry out and remember simple instructions, respond appropriately to co-workers and usual work situations, and had the ability to deal with a routine work setting, all of which describe unskilled work; the ability to follow detailed instructions is not required for unskilled positions. *See also, Johansen v. Barnhart,* 314 F.3d 283, 289 (7th Cir. 2002) (hypothetical posed to VE adequately accounted for claimant's specific limitations related to the areas of concentration, persistence, and pace based on medical experts' opinion that claimant's limitations in ability to maintain a regular schedule and attendance still allowed him to perform low-stress, repetitive work).

Finally, we note that any alleged error by the ALJ in addressing Mr. Johnson's limitations as to concentration, persistence and pace is again harmless. The only medical opinion that assessed Mr. Johnson as having moderate difficulties with a single aspect of concentration, persistence and pace – ability to follow detailed directions – was Dr. Gilliland's second psychiatric review technique, which plainly stated that it was an assessment as of September 2, 2011, nearly six months after Mr. Johnson's DLI. Dr. Gilliland's assessment of Mr. Johnson for the time during the claims period specifically noted that there was insufficient evidence of

---

decisions, and the ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable rest periods (R. 524-25).

depression to make a finding that Mr. Johnson was disabled prior to the DLI. Plaintiff does not point to any evidence to dispute this finding.

## C.

We turn to plaintiff's argument that the ALJ gave insufficient reasons for finding that Mr. Johnson's complaints about the severity of his impairments were not entirely credible. As an initial matter, we note that as long as the ALJ gives specific reasons supported by the record, we will not overturn a credibility determination unless it is "patently wrong." *Curvin v. Colvin,* 778 F.3d 645, 651 (7th Cir. 2015). The ALJ's use of the oft-criticized boilerplate language when discussing Mr. Johnson's credibility is not a basis for upsetting the credibility determination here, because the ALJ did not rely exclusively on the boilerplate, but instead went further and gave specific reasons for finding Mr. Johnson's statements about the severity of his conditions were not entirely credible. *Pepper v. Colvin,* 712 F.3d 351, 368-69 (7th Cir. 2013) ("the simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination").

In this case, we again note that the record is sparse in terms of objective medical evidence prior to Mr. Johnson's DLI. While he did visit Heartland regularly for a variety of ailments, the majority of Mr. Johnson's treatment consisted of medication management, and only four of those appointments occurred during the claims period. Mr. Johnson did not undergo any medical tests or invasive procedures, therapies or other diagnostic activities. Further, none of the opinions of the treating or consultative physicians (including Mr. Johnson's main treating physician, Dr. Thota) supported his claim of total disability. Therefore, the bulk of the evidence concerning the severity of Mr. Johnson's impairments relied on his own allegations concerning his symptoms,

which makes his burden of proving that he was actually as impaired as he contended a difficult one. *Curvin,* 778 F.3d at 651.

After reviewing the medical evidence, the ALJ found that, although Mr. Johnson testified about his various physical symptoms, his treatment has been primarily conservative and non-acute, and he rarely made specific complaints of disabling pain at his medical appointments. Moreover, the ALJ noted that Mr. Johnson's ability to work as a security guard at a football game soon after the alleged onset of his disability cast doubt on his contentions about the severity of his symptoms, as did his continued attempts to find work.[21] Similarly, it was not improper for the ALJ to find that Mr. Johnson's sporadic work history even well before his alleged onset date suggested that it was not Mr. Johnson's impairments that were preventing him from taking on full time employment. *Slayton v. Colvin,* 629 Fed.Appx. 764, 770 (7th Cir. 2015) (upholding credibility determination based on claimant's subjective complaints when ALJ considered testimony, conservative treatment, daily activities, and fact that plaintiff worked only sporadically prior to onset date).

In sum, the ALJ discussed the breadth and depth of Mr. Johnson's medical treatment, his daily activities, his holding a security job that required interpersonal skills he claimed not to have, his statements to Heartland that he did not drink alcohol that were belied by his several hospitalizations for intoxication, and the inconsistency between his testimony that his depression would prevent him from working and information from his therapist that Mr. Johnson was trying to find a job because working made him feel better. The issues Mr. Johnson raises with respect to

---

[21] As we explained above, we do not find Mr. Johnson's ability to perform part-time work to be necessarily indicative of his ability to hold a full-time job. Instead, the particular type of work he performed, in a public setting, casts doubt on his credibility with respect to his mental health impairments and ability to interact with the public.

the ALJ's credibility finding do not convince us that the ALJ's credibility determination was patently wrong.

Mr. Johnson argues that the ALJ did not fully consider his subjective complaints of pain. But this argument goes to the weight the ALJ gave Mr. Johnson's testimony; it does not demonstrate an error of apprehension. And, we cannot reweigh evidence simply because the claimant disagrees with the ALJ's conclusion. *McKinzey v. Astrue,* 641 F.3d 884, 889 (7th Cir. 2011). Plaintiff also argues that the ALJ's mention that Mr. Johnson continued to smoke despite medical recommendations to stop cannot be the basis for a credibility determination because the recommendation was not a prescribed treatment. SSR 02-1p. While we agree that a credibility determination based on non-compliance is limited to failure to adhere to a prescribed treatment that would improve plaintiff's condition, the ALJ's mention of Mr. Johnson's failure to quit smoking is at most harmless error. The ALJ relied on many other factors in finding Mr. Johnson not fully credible, and so his additional mention that Mr. Johnson did not stop smoking when his doctor advised him to does not render erroneous the overall credibility determination.

Finally, the ALJ did not err in considering Mr. Johnson's daily activities as they related to his credibility. A claimant's ability to perform various activities of daily living is one factor an ALJ may consider when assessing credibility, but the ALJ must explain any inconsistencies between a claimant's activities and the medical evidence. *Jelinek v. Astrue,* 662 F.3d 805, 812 (7th Cir. 2011). In this case, the ALJ explained that Mr. Johnson's extensive daily activities were not nearly as limited as one might expect, given Mr. Johnson's complaints of disabling symptoms and limitations. These activities include bathing, dressing himself, cooking, washing dishes, shopping and taking public transportation alone, and occasionally going to visit family. As we explained above, there is scant medical evidence prior to the DLI to support Mr.

Johnson's alleged impairments and so the ALJ was justified in considering Mr. Johnson's activities in light of his own testimony about his symptoms. We find no error in the ALJ's assessment that Mr. Johnson's daily activities cast doubt on his credibility about the overall severity of his impairments.

## CONCLUSION

For the foregoing reasons, we grant the Commissioner's Motion for Summary Judgment (doc. # 22), and deny plaintiff's Motion for Summary Judgment (doc. # 9). The case is terminated.

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATED:   September 12, 2016**